# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH


## NO. 2-06-430-CV

A.J. MORRIS, M.D., P.A., RIO
GRANDE VALLEY IMAGING,
INC., AND A.J. MORRIS, M.D.

APPELLANTS

V.

DE LAGE LANDEN FINANCIAL
SERVICES, INC.

APPELLEE

------------

### FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellants A.J. Morris, M.D., P.A. ("AJMPA"), Rio Grande Valley

Imaging, Inc. ("RGVI"), and Dr. A.J. Morris appeal from a summary judgment

granted for Appellee De Lage Landen Financial Services, Inc. ("DLFS").

Because we hold that DLFS established its right to summary judgment on some

---

[1] *See* Tex. R. App. P. 47.4.

of its claims for damages but not for others, we affirm in part and reverse in part.

## Background Facts

DLFS is in the business of arranging for the leasing and financing of commercial equipment, sometimes under a name other than DLFS. For a time, DLFS had a business agreement with Toshiba American Medical Systems, Inc. ("TAMS") under which DLFS leased out equipment made by TAMS. The business agreement provided that DLFS would use the name Toshiba American Medical Credit ("TAMC") in executing the leases.

Using the TAMC name, DLFS entered into a lease with AJMPA in 1998 (the "1998 lease"). The lease stated that the lessor was "Toshiba American Medical Credit, a program of Toshiba American Medical Systems, Inc." Dr. Morris also entered into a guaranty covering that lease. Appellants claim that they did not know that TAMC was the same entity as DLFS or that TAMC, rather than TAMS, was the lessor.

In 2000, AJMPA and RGVI entered into a lease with TAMC (the "2000 lease"), and Dr. Morris executed a guaranty for the lease. TAMC subsequently sent AJMPA letters notifying it that both leases had been assigned to DLFS.

Under both the 1998 lease and the 2000 lease, AJMPA and RGVI agreed to pay sales tax on the equipment as well as property tax assessed against the

2

equipment. The leases also provided for the payment of late charges and finance charges for untimely rental payments. The leases allowed AJMPA and RGVI to purchase the equipment at the end of the lease for ten percent of the original acquisition amount so long they were not in default and they exercised the option not less than 180 days before the end of the lease term.

After AJMPA and RGVI ceased making payments on the leases, DLFS sent notice of default to Dr. Morris, demanding compliance with the lease obligations and notifying him that it was entitled to declare him, as guarantor, liable for the entire amount owing under the leases. When no payments were made, DLFS filed suit against Appellants.

**Procedural History**

A number of Appellants' issues depend on what pleadings were filed and when. In DLFS's original petition, it asserted breach of contract and unjust enrichment claims and sought attorney's fees. Appellants filed an answer and counterclaims.

DLFS then filed a motion for summary judgment. DLFS sought $941,753.81 in damages for unpaid rent, property tax, and sales tax; late charges and finance charges; the remaining accelerated payments on the 2000 lease; and the purchase option value of the equipment. DLFS also sought $55,000 in attorney's fees. With its motion, DLFS attached the affidavit of

3

Jake Hornung and various business records. DLFS also sought no-evidence and traditional summary judgment on Appellants' counterclaims.

Appellants filed an amended answer and an amended counterclaim, adding a claim for rescission. Appellants also filed a response to the summary judgment motion to which they attached as evidence an affidavit from Dr. Morris; a letter from Dr. Morris to DLFS from April 2003, informing DLFS that he wished to exercise the purchase option at the end of the 1998 lease; and a letter from TAMC to Dr. Morris, offering him terms for the 2000 lease.

DLFS filed a motion to strike portions of Dr. Morris's affidavit and a motion for leave to file additional summary judgment evidence. The trial court granted both motions and granted partial summary judgment ("first summary judgment") disposing of DLFS's breach of contract claims.

Appellants then filed a second amended answer and second amended counterclaim and a motion to set aside the first summary judgment. DLFS filed an answer and special exceptions to the second amended counterclaim.

Appellants filed a third amended answer and second amended counterclaim. DLFS filed another answer and again filed special exceptions to the second amended counterclaim. Appellants filed a response to the special exceptions as well as a first supplement to the second amended counterclaim.

DLFS filed an answer and special exceptions to the first supplement. The

4

trial court held a hearing on the special exceptions, and at the conclusion of the hearing stated that it granted the special exceptions, dismissed Appellants' counterclaims, and granted final judgment. The court requested the parties to provide an order to that effect. DLFS filed a proposed order. The proposed order does not appear in the record, nor does any written order from this hearing.

Appellants next filed an amended motion to vacate or modify the first summary judgment. DLFS filed a response to that motion. It then filed a second motion for summary judgment incorporating by reference evidence filed with its first summary judgment motion. In the motion, DLFS asked the trial court for a judgment clarifying that DLFS was entitled to the return of the leased equipment as a result of the favorable judgment on its breach of contract claims. It also sought judgment on Appellants' counterclaims. Appellants filed a response, with evidence attached, and objections to DLFS's summary judgment evidence. At the hearing on the motion, DLFS stated that it did not object to Appellants' evidence being considered for purposes of the second motion but that it did object to any attempt by Appellants to use the evidence to relitigate the first summary judgment.

After a hearing, the trial court granted the second summary judgment for DLFS. The order stated that it "supercede[d] and replace[d]" the first summary

5

judgment order. The trial court subsequently entered an order denying Appellants' objections to DLFS's summary judgment evidence. After the trial court denied Appellants' motion for reconsideration and for new trial, they filed this appeal.

**Analysis**

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim.[2] When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[3]

In Appellants' first issue, they argue that the evidence and objections they filed in response to DLFS's second summary judgment motion were also applicable to DLFS's first summary judgment motion.

Assuming for the moment that DLFS's evidence established its right to judgment, the burden then shifted to Appellants to raise a genuine issue of material fact to prevent summary judgment.[4] Objections to Appellee's evidence

---

[2] *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

[3] *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004).

[4] *See* Tex. R. Civ. P. 166a.

6

and any evidence on which Appellants relied to raise fact issues had to be presented to the trial court before it ruled on the claims.[5] Thus, if in the second summary judgment proceedings, the same claims were not before the trial court, any objections to the evidence would come too late, as would any evidence produced by Appellants to raise fact issues.

The question is therefore whether DLFS's breach of contract claims were before the trial court after the first summary judgment. The issues determined by a summary judgment are final even though the judgment is interlocutory, and a party may not continue to litigate the issues so determined unless the judgment is set aside by the trial court or reversed on appeal.[6] If a trial court decides some of the contested issues prior to trial in a partial summary judgment, the trial court may later revisit those issues while it retains plenary power over the judgment as long as the parties are given a fair opportunity to

---

[5] *See* Tex. R. Civ. P. 166a(c) (stating the summary judgment shall be rendered if the evidence on file before judgment shows there is no genuine issue as to any material fact).

[6] *Martin v. First Republic Bank, Fort Worth, N.S.*, 799 S.W.2d 482, 488–89 (Tex. App.—Fort Worth 1990, writ denied); *see also Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 558 n.5 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (stating that because the trial court had already decided an issue in the first summary judgment, that issue was not before the court in a second summary judgment and the court properly refused to consider it).

present evidence on the issues.[7] A statement in a final judgment that it supercedes and replaces a previous partial summary judgment does not necessarily demonstrate that the trial court revisited the previously litigated issues.[8] That the trial court's final judgment is inconsistent with its prior grant of partial summary judgment and that, during trial on the remaining issues, the trial court heard evidence relating to the issues previously decided are indications that a trial court reconsidered previously litigated issues.[9]

Consideration of the record of the hearing on the second summary judgment and a comparison of the two orders granting summary judgment show that in the second summary judgment proceeding, the trial court determined only those issues raised in the second summary judgment motion—DLFS's entitlement to the return of the equipment and Appellants' counterclaims. The trial court repeatedly mentioned in the hearing that it had already granted final summary judgment in the previous hearing on the special exceptions. The court stated that it understood that the parties disputed whether the second summary judgment motion was "just more of a clean up"

---

[7] *Elder Constr., Inc. v. City of Colleyville*, 839 S.W.2d 91, 92 (Tex.1992); *see also Luecke v. Wallace*, 951 S.W.2d 267, 275 (Tex. App.—Austin 1997, no writ).

[8] *Luecke*, 951 S.W.2d at 275.

[9] *Id.*

or whether the court could consider Appellants' objections to DLFS's summary judgment evidence. The court ultimately overruled Appellants' objections, and it entered a judgment that is entirely consistent with the first summary judgment. The second summary judgment expanded the amount of prejudgment interest to include the time from the first summary judgment to the second and addressed the issues raised by the second summary judgment motion but in all other respects matched the first summary judgment. The trial court did not revisit the issues of existence of lease contracts, performance by DLFS, breach of contract by Appellants, or damages; those issues were not litigated in the second summary judgment proceeding. Thus, Appellants could not rely on objections made in or evidence attached to their response to the second summary judgment to revisit those issues previously adjudicated. We overrule Appellants' first issue.

But although Appellants could not rely on objections made after judgment to prevent summary judgment, on appeal, Appellants may raise new objections to the substance of DLFS's evidence to challenge whether DLFS's evidence was sufficient to establish its right to judgment.[10] In Appellants' third issue,

---

[10] *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 498 (Tex. App.—Fort Worth 2002, no pet.) (holding that defects in substance may be raised for the first time on appeal).

they argue that DLFS's evidence was insufficient because it was based entirely on the affidavit of Jake Hornung, a "litigation specialist" with DLFS, which they contend was not competent summary judgment evidence. We note that under this issue, Appellants do not object to this evidence with respect to their counterclaims.

Appellants object that Hornung's affidavit fails to meet the business records exception to the hearsay rule because the affidavit was not made by a person with knowledge of the facts asserted and does not state or prove that Hornung or another DLFS employee made the records in the regular scope of business or made the records at or near the time of the event. They also object that the affidavit does not satisfy rule 902(10) of the Texas Rules of Evidence. These are objections to the form of the affidavit and had to be timely raised in the trial court to be raised on appeal.[11] Appellants also object that Hornung's lack of personal knowledge prevents the affidavit from constituting competent

---

[11] *See* Tex. R. Civ. P. 166a(f) (stating that defects in the form of affidavits "will not be grounds for reversal unless specifically pointed out by objection"); *Grand Prairie ISD v. Vaughan*, 792 S.W.2d 944, 945 (Tex. 1990) (noting that failure to object to a defect of form in an affidavit results in waiver of the objection); *St. Paul Ins. Co. v. Mefford*, 994 S.W.2d 715, 721 (Tex. App.—Dallas 1999, pet. denied) (stating that hearsay in an affidavit is a defect of form).

summary judgment evidence. This objection is also an objection to form.[12]

Appellants did not make these objections to the affidavit until after the trial

court had entered judgment on the breach of contract claims, and therefore we

will not consider them in determining whether DLFS established its breach of

contract claims.

But Appellants also object to statements in Hornung's affidavit that they

allege are conclusory. An objection that a statement is conclusory is an

objection to substance, not form, and may be raised for the first time on

appeal.[13] We therefore consider Appellants' arguments on these objections.

Appellants' first objection is that the statement by Hornung that DLFS

was the lessor of the equipment is a legal conclusion. Appellants refer to

Hornung's repeated statements that DLFS entered into the leases with AJMPA

and RGVI using the TAMC name. Appellants appear to argue that because they

---

[12] *See Vaughan*, 792 S.W.2d at 945 (stating that an objection that an affidavit is not based on personal knowledge is a defect of form); *Tri-Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 448 (Tex. App.—Fort Worth 2005, pet. denied) (noting same parenthetically).

[13] *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (holding that conclusory statements cannot support a judgment even when no objection was made to the statement at trial).

11

dispute the identity of the lessor and contend that the lessor was TAMS rather than TAMC or DLFS, Hornung's statements constitute legal conclusions.

A statement is conclusory when it does not provide the underlying facts to support it.[14]  To the extent that these statements are conclusory, any error by the trial court in considering them was harmless as to DLFS's breach of contract claims because sufficient summary judgment evidence demonstrates that DLFS is currently the lessor under the two leases.[15]  DLFS's summary judgment evidence included:  (1) the 1998 lease between TAMC, a program of TAMS, as lessor, and AJMPA as lessee; (2) a letter from TAMC to Dr. Morris confirming changes in the monthly payment under the 1998 lease, as provided in the lease; (3) a letter from TAMC to AJMPA stating that the 1998 lease had been assigned to DLFS; (4) the 2000 lease between TAMC, a program of TAMS, as lessor, and AJMPA and RGVI; (5) a letter from TAMC to AJMPA and RGVI stating that the 2000 lease had been assigned to DLFS; (6) the 1998 guaranty between Morris and TAMC; and (7) the 2000 guaranty between

---

[14] *Residential Dynamics*, *LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006, no pet.); *see also* Black's Law Dictionary 308 (8th ed. 2004) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based").

[15] *See* Tex. R. App. P. 44.1(a)(1) (stating that judgment may not be reversed on appeal unless the complained of error probably caused the rendition of an improper judgment).

12

Morris and TAMC. Appellants do not deny that they entered into the leases and guaranties at issue in this case. In their brief, Appellants acknowledge that letters were forwarded to AJMPA and RGVI that "purportedly indicat[ed] that the 1998 and 2000 [leases] had been assigned to [DLFS]," although they contend that the letters were sent by TAMS.

Appellants' response to the first summary judgment motion included a 2003 letter from Dr. Morris, on behalf of AJMPA, to DLFS indicating that he wished to exercise the purchase option at the end of the 1998 lease. Thus, Dr. Morris understood that DLFS was the lessor at that time with respect to at least the 1998 lease. As for the 2000 lease, Appellants included with their evidence a proposal letter from TAMC to Dr. Morris and RGVI offering contract terms for the 2000 lease. The letter is from TAMC and signed by a TAMC representative and does not refer to TAMS as lessor in any capacity. The letter states that TAMS is the manufacturer of the equipment and that TAMC would be the lessor. Thus, Appellants' own evidence demonstrates that they were aware that the 2000 lease contract was being offered by TAMC as lessor. And, as with the 1998 lease, Appellants received a letter indicating that the 2000 lease had been assigned to DLFS.

Appellants produced no evidence raising a fact issue as to whether DLFS is now the lessor under the leases and guaranties, and DLFS demonstrated as

13

a matter of law the existence of the contracts at issue between it and Appellants.  Whether DLFS fraudulently represented to Appellants that TAMS was the lessor at the time the leases were entered into is relevant to Appellants' counterclaims but not to DLFS's burden of proving that it is currently the lessor who may enforce the leases and guaranties with respect to its breach of contract claims.

Appellants also object that Hornung's statement that DLFS "has performed its obligations under the Lease and Guaranties" is conclusory.  We agree but hold that any error by the trial court in considering it was harmless.  Under the lease agreements, AJMPA and RGVI agreed to lease certain medical equipment, and it is undisputed by the parties that the equipment was delivered as agreed.

Appellants argue, however, that DLFS breached the leases by failing to comply with the  lease end option in the 1998 lease by never providing AJMPA with the original acquisition cost of the equipment so that it could calculate the lease end purchase price.  They also argue that DLFS breached the leases by wrongfully attempting to repossess the equipment in November 2005, damaging the equipment in the process.

Although Dr. Morris may have notified DLFS in 2003 that AJMPA wished to exercise the purchase option at the end of the lease, the lease provided that

14

such option could only be exercised if no event of default had occurred and remained uncured. Dr. Morris admitted in his affidavit attached to Appellants' response to the first summary judgment motion that he stopped making payments on the equipment, which is an event of default under the leases. In addition to statements in Hornung's affidavit regarding Appellants' payment history, DLFS provided as summary judgment evidence an accounting history showing that the monthly rent payment for May 2004, the final month of the original lease term, was not paid until 2005. Furthermore, AJMPA was provided with what DLFS contends is the acquisition cost in a letter it sent to Dr. Morris in March of 1999. Although Dr. Morris disputes that this amount is the actual acquisition cost of the equipment, the fact that he disputes how much DLFS expected him to pay to exercise the option does not raise a fact issue on whether he was furnished with the information. We also note that Dr. Morris did not indicate a disagreement with the quoted acquisition cost when he sent the letter in 2003 stating that he wished to exercise the lease end purchase option. Because there existed an uncured event of default at the expiration of the 1998 lease and therefore DLFS was under no obligation to allow Appellants to purchase the equipment and because DLFS did provide Appellants with the acquisition cost, Appellants failed to raise a fact issue as to whether DLFS performed under the leases.

15

Furthermore, Appellants cannot argue on appeal that DLFS wrongfully attempted to repossess the equipment and thereby breached the leases. DLFS's attempt to repossess the equipment occurred after the trial court had entered the first summary judgment ruling on DLFS's breach of contract claims. An event occurring after adjudication of a breach of contract claim cannot be a consideration in the trial court's determination of the plaintiff's prior breach.[16] Thus, because DLFS sufficiently established that it performed its obligations under the leases and guaranties, and because Appellants did not raise a genuine issue of material fact on the issue, any error by the trial court in considering Hornung's statement to that effect was harmless.

Appellants next object to statements by Hornung with respect to Appellants' breach of the leases. They first object to his statement as to Appellants' (1) delay or failure to make lease payments; (2) failure to exercise the purchase option on the equipment; (3) retaining possession of the equipment; (4) failure to pay property taxes; (5) defaults on the leases; (6) failure to cure the defaults; and (7) refusal to perform under the lease

---

[16] *See, e.g.*, *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 323 (Tex. App.—Houston [1st Dist.] 1995) (op. on reh'g) (stating that "a trial court can only consider pleadings and proof on file at the time of the hearing, or filed after the hearing and before judgment with the permission of the court").

agreements and personal guaranties. Rather than point out specific objectionable statements by Hornung, Appellants point to nine paragraphs, which we note take up almost three full pages, that they say contain conclusory statements about these seven subjects.[17] In our review of these three pages, we found only one conclusory statement—that DLFS had performed its contractual obligations, a statement we have already discussed.

Finally, Appellants object to Hornung's statements over nine pages of his affidavit regarding DLFS's alleged damages resulting from the breaches of the 1998 and 2000 leases. Appellants do not point out which specific statements they believe are conclusory. After reviewing the nine pages at issue, we found only one conclusory statement. On page ten of his affidavit, Hornung states that DLFS "has determined that the amount of taxes associated with the [1998 lease] for the calendar year of 2005 is $10,159.38." Unlike the amount of taxes billed for the 2003 and 2004 years, Hornung does not provide the basis for this calculation, support the statement with documentary evidence, or demonstrate any personal knowledge of how DLFS arrived at this figure.

---

[17] *See Churchill v. Mayo*, 224 S.W.3d 340, 347 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing former rule 38.1(h) of Texas Rules of Appellate Procedure and concluding that Mayo presented nothing for review on her objection to an affidavit as conclusory by failing to identify any particular statement in the affidavit).

17

Because this statement was conclusory, the trial court should not have considered it.[18] We sustain Appellants' third issue as to this statement and overrule their issue as to the remainder of their objections.

In Appellants' second issue, they contend that DLFS failed to prove that no genuine issue of material fact existed on its breach of contract claims and its asserted damages. To establish its right to judgment, DLFS first had to establish the existence of a valid contract between it and Appellants; its performance under the contract; breach of the contract by Appellants; and damages sustained by DLFS as a result of Appellants' breach.[19]

As discussed above, DLFS established as a matter of law the existence of a contract between it and Appellants and performance by DLFS. DLFS also established that Appellants breached the leases. And, because the guaranties provided that an event of default under the lease constituted an event of default under the guaranty, DLFS also established that Appellants breached the guaranties. Appellants argue, however, that they made all of the requisite lease payments and timely and properly exercised the lease end option under the 1998 lease. Although Appellants may have made the requisite number of

---

[18] *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (stating that a conclusory affidavit does not raise a fact issue).

[19] *See Residential Dynamics*, 186 S.W.3d at 198.

monthly payments under the 1998 lease, they did not do so until 2005 and therefore did not do so without first breaching the lease agreements. Furthermore, as discussed above, Dr. Morris's attempt to exercise the lease end purchase option on the 1998 lease had no effect because of the existence of an uncured event of default at the end of the lease term.

Appellants also argue that a genuine issue of material fact exists as to whether AJMPA and RGVI complied with the 2000 lease. In his own affidavit, Dr. Morris stated that he stopped making payments on the equipment, which under the lease was an event of default. Appellants did not timely offer any other evidence raising a fact issue on compliance with the lease. DLFS established a prima facie case that Appellants breached the 2000 lease, and Appellants failed to demonstrate that a genuine issue of material fact exists on the matter. Appellants attempted to introduce evidence that they contend raised a fact issue on the matter, but they did not do so until after the first summary judgment. Because the issue of breach of contract was never relitigated after that judgment, that evidence, even if it raised a fact issue, was not timely before the trial court on the issue of Appellants' breach.

We now consider whether DLFS established its damages as a matter of law. With respect to the 1998 lease, DLFS asked the court to award $285,871.80 in damages for unpaid monthly rent payments. Although

Appellants assert on appeal that the 1998 lease only required fifty-seven payments, in their counterclaims filed before the first summary judgment, they alleged that the 1998 lease required sixty payments. The lease itself failed to provide the rental payment for the last several months of the lease. It expressly set out that for the first three months, no payment would be required, and it expressly set out the rent due for months four through sixty – $19,257.43 in base rent, $5,200 for a service agreement, and $2,017.81 in taxes. But through an omission, the lease says nothing about what rent, if any, would be due for months sixty-one through sixty-three. Because the parties clearly knew how to specify when no rent was required, we cannot assume that they intended for no rent to be due for the last several months of the term.

Appellants are bound, however, by their judicial admissions. "Assertions of fact, not plead in the alternative, in the live pleadings of a party are regarded as formal judicial admissions."[20] Appellants in their counterclaim filed before the first summary judgment asserted that the 1998 lease "provided for 60 payments in the sum of $26,475.24 each which allegedly included sales tax in the amount of $2,017.81." They repeated this assertion in their amended

---

[20] *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (quoting *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983)).

counterclaim, also filed before the first summary judgment. The statement is clear and unequivocal and was not pleaded in the alternative.[21] They did not repeat this assertion in their amended counterclaims filed after the first summary judgment; however, at the time the trial court ruled on DLFS's breach of contract claim, their live pleadings did contain this statement of fact. Thus, the terms of the original contract were established to include 60 payments of $26,475.24 each, which included the base payment of $19,257.43, sales tax, and the service agreement payment.[22]

Because the actual cost of the equipment differed from the cost on which the lease payments were calculated, TAMC sent a letter to AJMPA modifying the rent payment. The lease allowed TAMC to change the amount of rent by up to fifteen percent if the actual cost differed from the estimate.

As with the original lease, the letter contained a mistake. Where the original lease had an omission, the letter amending the lease contained a typographical error stating that the new lease term requires "36 payments." But the letter taken as a whole demonstrates that "36 payments" was a

---

[21] *Id.* at 568 (noting that judicial admission that is clear and unequivocal has conclusive effect).

[22] *Houston First Am. Sav.*, 650 S.W.2d at 767 (stating that "[a]ny fact admitted is conclusively established in the case without the introduction of the pleadings or presentation of other evidence").

typographical error. The original contract had a lease term of sixty-three months. The letter reasserts that the original contract had a lease term of sixty-three months. The letter's purpose was to change the lease payments to reflect the actual cost of the equipment, and it states that all other lease terms and conditions would remain the same. The letter states that as amended the lease calls for no payment through the third month and payments of $19,058.12, plus sales tax and $5,200 as the service agreement payment, for months four through sixty-three, for a total of $26,058.12. Taking the letter in its entirety, "36 payments" is clearly a typographical error. The amendment letter obviously did not intend to change the duration of the lease.

Under the terms of the lease, DLFS's change of the rent payment amount was valid. A contract may provide a party to it with the right to amend the contract.[23] The lease agreement provided TAMC with such a right—the right to change the amount of rent by up to fifteen percent. TAMC could therefore validly adjust the monthly base rent payment for months four through sixty-three from $19,257.43 to $19,058.12 because the adjustment changed the

---

[23] *See Couch v. Southern Methodist Univ.*, 10 S.W.2d 973, 974 (Tex. Com. App.1928, judgm't adopted) (noting that contract may include the right to amend the contract but the right "implies only those changes contemplating a correction, improvement, or reformation of the agreement rather than a complete destruction of it").

base rent by less than fifteen percent. The trial court therefore could determine that the base rent payments should have been $19,058.12.

Having determined as a matter of law the amount owed for each month under the 1998 lease, the trial court then had to determine whether DLFS established as a matter of law the number of payments that Dr. Morris failed to pay. Although Dr. Morris admitted in his affidavit that he stopped making payments on the equipment, he did not say when this occurred, and thus the affidavit did not establish how much unpaid rent he owed to DLFS. A DLFS accounting report that DLFS included as summary judgment evidence showed that Appellants did not pay the May 2004 payment until 2005 and showed no payment for any months after May 2004. And Hornung's affidavit stated that Appellants had missed fifteen payments, for the months of June 2004 to August 2005. Fifteen months of payments of $19,058.12 is $285,871.80, the amount claimed by DLFS. DLFS therefore established the amount of damages the trial court awarded it for unpaid rent under the 1998 lease.

DLFS also established the amount of sales tax owed on those months of unpaid rent. Hornung's affidavit stated that the tax rate is 8.25 percent. That percentage applied against the monthly rent payment is $1,572.29 per month, for a total of $23,584.35. DLFS apparently opted not to ask for an award of the additional costs for collecting and administering tax payments that under

23

the lease it was entitled to be paid. DLFS thus established the amount of damages the trial court awarded it for unpaid sales tax under the 1998 lease.

DLFS also claimed $20,971.48 in late charges and finance charges. Hornung's affidavit stated that Appellants had not paid this amount. DLFS's accounting report showed that DLFS charged that amount for late charges and finance charges and indicated that those charges were not paid. Thus, the trial court did not err by awarding that amount in damages.

DLFS further claimed damages for unpaid property taxes on the equipment, taxes that Appellants agreed to pay as part of the lease agreement. Hornung asserted that the taxes assessed against the equipment came to $13,682.61 for 2003 and $11,110.76 for 2004. For tax years 2003 and 2004, DLFS included statements from the city and county taxing authorities showing the amounts owed for all of DLFS's personal property in the county, checks from DLFS to the taxing authorities paying the billed amounts, and an accounting report showing that DLFS billed Appellants for the taxes and that Appellants had not paid them. According to Hornung, the accounting reports show that the bills DLFS sent to Appellants failed to reflect two small discounts from the taxing authorities ($64.98 for 2003 and $52.44 for 2004) but correctly showed two administrative fees of $62.50, charged each year and provided for under the leases as a cost for collecting and making the tax

24

payments. The damages sought by DLFS include the amounts charged by the taxing authorities, including the discounts, plus the administrative fees. The evidence demonstrates the amount of property taxes that DLFS was entitled to recover for 2003 and 2004.

Although Dr. Morris argued in his affidavit that the assessed value of the equipment was out of line with the fair market value of the equipment and that he had attempted to appeal the assessment with the appropriate taxing authorities, this does not defeat DLFS's right to summary judgment on this claim for damages. Appellants agreed to pay the assessed taxes, which is what DLFS billed them for and what they did not pay, and under the leases DLFS was entitled to recover the amounts sought in its summary judgment motion. Thus, the trial court did not err by awarding damages of $13,807.61 for the 2003 tax year and $11,235.76 for the 2004 tax year.

For tax year 2005, DLFS claimed damages of $10,159.38. The only evidence in the record supporting this amount is a statement in Hornung's affidavit that DLFS "has determined the amount of taxes associated with the 1998 [lease] for the calendar year of 2005 is $10,159.38." We have already held that this statement is conclusory, and therefore it is not competent evidence of the 2005 taxes. Because DLFS included no other evidence of the

25

2005 taxes, the trial court erred by awarding damages for property taxes for the 2005 tax year under the 1998 lease.

Finally, DLFS asked for damages for the agreed-upon purchase option value of the equipment, if Appellants wanted to purchase the equipment. The trial court did not award damages for this amount and instead awarded DLFS possession of the equipment. We therefore do not need to consider whether DLFS established the purchase option value of the equipment as a matter of law.

With respect to the 2000 lease, DLFS asked for unpaid rent in the amount of $148,964.31. DLFS produced summary judgment evidence of the lease, which established the monthly base payment of $16,551.59. Dr. Morris admitted in his affidavit that he stopped making payments on the leased equipment. Hornung stated in his affidavit that AJMPA and RGVI did not make the monthly payments for the months of December 2004 through August 2005. Nine months of unpaid rent at a rate of $16,551.59 a month is $148,964.31. DLFS therefore met its burden of establishing damages for unpaid rent under the 2000 lease.

DLFS further sought damages for the remaining payments that were accelerated under the lease and the purchase option value of the equipment. The lease permitted DLFS to accelerate the payments due under the lease upon

26

an event of default, discounted "at an annual rate equal to the lesser of six percent (6%) or the implicit rate of interest of the Lease." Hornung stated in his affidavit that DLFS was entitled to $198,619.08 in damages for the accelerated payments, based on the monthly rent provided for by the lease multiplied by the number of months left on the lease. Hornung stated that the purchase option value of the equipment as set out in the lease was $79,868.70. The two sums together equals a total of $278,487.78 in damages.

According to Hornung, $278,487.78 discounted to present value comes to $267,540.55. Hornung expressly stated that DLFS used a discount rate of six percent. Hornung did not, however, state separately the present day value of each of the two categories of damages. Thus, if the trial awarded only one category of damages, Hornung's affidavit provided no basis for the trial court to determine the amount of that category discounted to present day value.

The trial court awarded DLFS $192,463.87, purportedly the amount of accelerated future payments discounted to present value. Not only is this figure not provided anywhere in the affidavit, but this appears to be a calculation of present day value that uses a discount rate of four percent, rather than six percent. DLFS did not include any other evidence on which this figure could be

27

based. Accordingly, the trial court erred by awarding this amount of damages for accelerated monthly rent payments.

As for damages of the agreed-upon purchase option value of the equipment, as with the 1998 lease, the trial court did not award damages for this amount and instead awarded DLFS possession of the equipment. We therefore do not need to consider whether DLFS established the purchase option value of the equipment as a matter of law.

DLFS also asked for unpaid property taxes for 2003 and 2004. Hornung stated in his affidavit that the taxing authorities billed DLFS $16,240.77 for 2003 and that, as with the 1998 lease, DLFS charged two administrative fees of $62.50 for the tax year, as provided under the lease. Hornung also stated that DLFS was taxed $14,122.55 for 2004 and that DLFS charged two administrative fees of $62.50 for the tax year. Hornung stated in his affidavit that DLFS never received payments from Appellants for the taxes. DLFS thus asked for a total of $16,365.77 for the 2003 taxes and $14,247.55 for the 2004 taxes. Hornung stated that these amounts were unpaid. Appellants failed to timely introduce any evidence that they paid when due the property taxes on the 2000 lease. DLFS established its damages for the amount of taxes owed under the 2000 lease for 2003 and 2004.

28

For tax year 2005, DLFS claimed damages of $12,882.78 under the 2000 lease. The only evidence in the record supporting this amount was a statement in Hornung's affidavit that DLFS "has determined the amount of taxes associated with the 2000 [lease] for the entire calendar year of 2005 is $12,882.78." Like Hornung's statement with respect to the 1998 lease, this statement is conclusory and not competent evidence of the amount of 2005 taxes. Because DLFS included no other evidence of the amount of 2005 taxes, the trial court erred by awarding damages for property taxes for the 2005 tax year under the 2000 lease.

DLFS's final category of damages was for the costs of inspecting the equipment in September 2005. DLFS alleged in its summary judgment motion that as part of its expenses in connection with its remedies under the leases, it had the equipment inspected. DLFS included the invoice from DLFS's agent, Medical Marketplace, for its costs of $8,212.97. The leases provided that Appellants were liable for any expenses incurred by the lessor in connection with the enforcement of any remedies under the leases, including expenses of repossessing the equipment. Hornung stated in his affidavit that the inspection was "as a result of [Appellants'] conduct."

The only evidence introduced by Appellants addressing this evidence was the affidavit of Dr. Morris, which, after the trial court sustained DLFS's motion

29

to strike portions of it, asserts that "[t]here is simply no reason to hire someone from California to inspect the equipment." This statement does not raise a fact issue as to whether DLFS was entitled to recover these damages under the leases. DLFS therefore established its entitlement to these damages under the leases.

Because DLFS's evidence was legally insufficient as to the amount owed on 2005 property taxes or the amount of damages for accelerated payments under the 2000 lease, we sustain Appellants' second issue on those points. We overrule the remainder of Appellants' second issue.

In Appellants' fourth issue, they argue that the trial court erred by granting summary judgment on Appellants' affirmative defense of DLFS's prior material breach, their counterclaims for fraud and intentional or negligent misrepresentation, and their claim of rescission of the lease agreements.

With respect to Appellants' affirmative defenses, they first argue that Morris signed the leases and guaranties under duress. Duress is an affirmative defense that Appellants had to plead and raise a fact issue on before the trial

court ruled on the breach of contract claims.[24]  Appellants failed to do so, and thus, we will not consider this argument.[25]

Appellants next argue that DLFS failed to comply with the lease end option for the 1998 lease and that DLFS breached both leases by wrongfully attempting to repossess the equipment in November 2005 and that by these acts, DLFS breached the leases.  Appellants never pleaded in the trial court that DLFS breached the leases by wrongfully attempting to repossess the equipment,[26] and as discussed above, the attempt by DLFS to remove the equipment did not occur until after the trial court had granted the first summary judgment on DLFS's breach of contract claims.[27]  As for Appellants' argument that DLFS breached the 1998 lease by failing to comply with the 1998 lease end option, we have already held that because Dr. Morris and AJMPA were in

---

[24] *See* Tex. R. Civ. P. 94 (requiring a party to affirmatively plead the affirmative defense of duress); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (stating that when "the party opposing a summary judgment relies on an affirmative defense, he must come forward with summary judgment evidence sufficient to raise an issue of fact on each element of the defense to avoid summary judgment").

[25] *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

[26] *See Clear Creek Basin*, 589 S.W.2d at 678; *Brownlee*, 665 S.W.2d at 112.

[27] *See Hussong*, 896 S.W.2d at 323.

31

default at the end of the 1998 lease, DLFS had no obligation to allow Dr. Morris to exercise the lease end option. We therefore reject Appellants' arguments that these actions allegedly taken by DLFS, if true, constituted a breach of the leases.

Appellants next make the point that in DLFS's first motion for summary judgment, DLFS did not move for summary judgment on Appellants' affirmative defenses. But DLFS did not need to move for summary judgment on Appellants' affirmative defenses.[28] Rather, to avoid summary judgment, Appellants had to produce evidence raising a fact issue on each element of their affirmative defenses.[29] We reject Appellants' argument and hold that the trial court did not err by granting summary judgment on Appellants' affirmative defenses.

We now consider whether the trial court erred by granting the second summary judgment on Appellants' counterclaims. In their amended

---

[28] *See Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 124 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (noting that a plaintiff moving for summary judgment has no obligation to negate the defendant's affirmative defenses); *see also Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 143 (Tex. App.—Corpus Christi 2006, pet. denied) (stating that Whataburger had no burden to address the defendant's affirmative defenses in moving for summary judgment).

[29] *See Brownlee*, 665 S.W.2d at 112.

counterclaims, filed after DLFS filed its first summary judgment motion but *before* the trial court granted the first summary judgment, Appellants asserted for the first time several DTPA claims. DLFS did not amend its summary judgment motion to address these new counterclaims.

In their third amended counterclaim, filed *after* the trial court granted the first summary judgment, Appellants dropped their DTPA claims and asserted the right of rescission based on intentional misrepresentation or negligent misrepresentation. In the supplement, Appellants added a fraud claim, contending that DLFS fraudulently represented to Appellants that the lessor was TAMS and promised to sell the leased equipment at ten percent of the lessor's acquisition cost.

DLFS filed special exceptions arguing numerous grounds for the dismissal of Appellants' counterclaims, including (1) the trial court had already ruled on the claims as a matter of law and (2) Appellants had waived the claims by not asserting them before the first summary judgment. The trial court orally granted the special exceptions and dismissed Appellants' counterclaims. In its second motion for summary judgment, DLFS reasserted those two grounds. In the trial court's order granting the second summary judgment, the court stated that at the special exceptions hearing, the court had orally ruled that the counterclaims "had previously been expressly ruled on by the Court or

33

otherwise adjudicated and/or were waived." The court then ordered that Appellants take nothing on their counterclaims.

Because the trial court's summary judgment rests on more than one ground, Appellants had to raise error as to each ground.[30] On appeal, however, Appellants argue only that the trial court had not considered and rejected their claims in the first summary judgment. They do not address DLFS's argument that their claims were waived because they were not timely asserted. Accordingly, we must affirm the summary judgment on their counterclaims based on the unchallenged ground of waiver.

Similarly, we hold that the trial court did not err by not allowing Appellants to replead because they could not cure their untimeliness by repleading.[31] We overrule Appellants' fourth issue.

---

[30] *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970) (holding that summary judgment must stand since it may have been based on a ground not specifically challenged on appeal); *see also Haire v. Nathan Watson Co.*, 221 S.W.3d 293, 301–02 (Tex. App.—Fort Worth 2007, no pet.) (affirming summary judgment on unchallenged ground); *Long v. Long*, 196 S.W.3d 460, 468–69 (Tex. App.—Dallas 2006, no pet.) (holding that an appellate court must affirm trial court's judgment if a separate and independent ground supporting it is not challenged on appeal); *Shelton v. Sargent*, 144 S.W.3d 113, 129 (Tex. App.—Fort Worth 2004, pet. denied) (affirming summary judgment on unchallenged ground).

[31] *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (noting that trial court need not give pleader opportunity to amend pleading when the pleading defect is of a type that cannot be cured by amendment).

**Conclusion**

We reverse the trial court's judgment in part and affirm it in part. Having sustained Appellants' second and third issues in part as to the awards of property taxes for the 2005 calendar year for both leases and the accelerated payments due under the 2000 lease, we reverse that part of the trial court's judgment awarding those damages and remand those three damages issues to the trial court for further proceedings. Having overruled Appellants' remaining issues, we affirm the remainder of the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: CAYCE, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED: January 22, 2009